**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

|                                         |     |                                    |
| --------------------------------------- | --- | ---------------------------------- |
| **CLAUDETTE HURT,**                     | )   |                                    |
|                                         | )   |                                    |
| **Plaintiff,**                          | )   |                                    |
|                                         | )   | **Case No: 10 C 8301**             |
| **v.**                                  | )   |                                    |
|                                         | )   | **Magistrate Judge Jeffrey Cole**  |
| **MICHAEL J. ASTRUE,**                  | )   |                                    |
| **Commissioner of Social Security,**    | )   |                                    |
|                                         | )   |                                    |
| **Defendant.**                          | )   |                                    |
|                                         | )   |                                    |

## <u>MEMORANDUM OPINION AND ORDER</u>

The plaintiff, Claudette Hurt, seeks review of the final decision of the Commissioner ("Commissioner") of the Social Security Administration ("Agency") denying her application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act ("Act"). 42 U.S.C. §§ 423(d)(2). Ms. Hurt asks the court to reverse and remand the Commissioner's decision, while the Commissioner seeks an order affirming the decision.

### I.

### PROCEDURAL HISTORY

Ms. Hurt applied for DIB on May 21, 2008, alleging that he became disabled on April 2, 2008, due to Scheuermann's Kyphosis (R. 110-113), a deformity of the curve of the spine. Her application was denied initially and upon reconsideration. (R. 50-52, 65-67). Ms. Hurt requested a hearing and, on December 1, 2009, appeared and testified, without representation, before an ALJ. (R. 26-49). In addition, Cheryl Hoiseth testified as a vocational expert. (R. 45-48). On February 4, 2010, the ALJ issued a decision finding that Ms. Hurt was not disabled because she could perform her past relevant

sedentary work in computer data entry. (R. 17-22). This became the final decision of the Commissioner when the Appeals Council denied Ms. Hurt's request for review of the decision on November 12, 2010. (R. 2-4). *See* 20 C.F.R. §§ 404.955; 404.981. Ms. Hurt has appealed that decision to the federal district court under 42 U.S.C. § 405(g), and the parties have consented to the jurisdiction of a Magistrate Judge pursuant to 28 U.S.C. § 636(c).

## II.

## THE EVIDENCE OF RECORD

### A.

### The Vocational Evidence

Ms. Hurt was born on December 20, 1951, making her almost fifty-nine years old at the time of the ALJ's decision. (R. 110). She has a high school education. (R. 31). Her most recent job was as a bus driver for handicapped persons from 2004 to 2008. (R. 153). Prior to that, she also worked very briefly as a store clerk, and worked in an office doing computer data entry from 1999-2000. (R. 153).

### B.

### The Medical Evidence

Ms. Hurt's main problem is clearly her back impairment. She has Scheuermann's Kyphosis, a defect in the curve of the spine resulting in a rounding or bowing of the back. She has had two surgeries on her spine – a diskectomy and a multilevel spinal fusion – and is a candidate for a third. (R. 218, 265, 276, 284). The spinal fusion involved the T12, L2, L4, and L5 levels of her spine. (R. 287).

In January of 2007, Ms. Hurt was complaining of back pain extending into both legs. (R. 287). She had an MRI that revealed minimal facet hypertrophy at L2-3, and bilateral facet hypertrophy at L4-5. (R. 287-88). More significantly, there was "diffuse disc bulge and bilateral facet hypertrophy . . . moderate to severe central canal stenosis . . . mild to moderate left-sided neural foraminal narrowing and moderate right-sided neural foraminal narrowing . . . fluid . . . within the facets . . . [s]light lateral recess narrowing . . . bilaterally at L4." (R. 287). Her treating physician, Dr. Ronjon Paul, called the stenosis "quite severe." (R. 284). He thought she might need yet another fusion but, with two prior surgeries, he recommended conservative treatment for the time being. (R. 284).

That treatment entailed multiple epidural steroid injections. Ms. Hurt had two at the L4 level of her lumbosacral spine on March 21, 2007. (R. 216, 278-281). That seemed to relive her back pain, but she continued having leg pain extending down to her ankles. (R. 273). She had a caudal injection at base of her spine on April 10th. (R. 273). Shortly after that procedure, on April 27th, Ms. Hurt was again complaining of low back and leg pain. She had another two injections at the L3 level of her lumbosacral spine. (R. 270-71). In the end, all this treatment provided her with only "minimal temporary relief." (R. 269).

Ms. Hurt turned to physical therapy. By June 12, 2007, this course had resulted in significant improvement of her back and leg pain. She asked her doctor whether she could return to work. Dr. Paul indicated he would release her for work in another two weeks, on June 25th. (R. 268). Again, Ms. Hurt's relief didn't last and she didn't tolerate her return to employment. In March of 2008, she was once again complaining of severe

pain that was exacerbated by walking any distance or lying on her side. (R. 263). Dr. Paul noted back pain, sciatica, and bilateral hip pain and tenderness. (R. 265). He sent her for another two injections, this time in both her hips. (R. 263).

Dr. Chukwu Emeka F. Ezike examined Ms. Hurt on July 16, 2008, for the Bureau of Disability Determination Services ("DDS"). (R. 217). He noted that Ms. Hurt still had back pain despite two surgeries. Hurt described constant back pain, about 8/10 in severity, which radiated into both lower extremities and caused numbness. She also said that she had arthritic pain in her thumbs and knuckles and occasional hand weakness that caused her to drop objects (R. 217). She told Dr. Ezike that she could stand or walk for 15 minutes and sit for up to 30 minutes at a time. (R. 218). Dr. Ezike found that Ms. Hurt had normal range of motion in her extremities and spine with mild pain in her lumbar spine and could walk 50 feet without support. Her grp strength was 4/5 bilaterally, and she was able to pick up a penny with both hands. Pinch strength was minimally reduced bilaterally. Straight leg raising was "equivocal" bilaterally. The doctor noted a healed midline surgical scar over her spine from the base of her neck to her waist line. No imaging or additional tests were performed. Hurt's overall effort and cooperation were satisfactory (R219). Dr. Ezike diagnosed Hurt with kyphosis, spinal stenosis, osteoarthritis with pain in the lower back, hips, and hands, and lumbar radiculopathy (R. 220).

Based on Dr. Ezike's evaluation (R. 229), Virgilio Pilapil, M.D., completed a physical RFC assessment for DDS on August 7, 2008. He found that Ms. Hurt could lift 50 pounds occasionally, 25 pounds frequently; stand/walk for about six hours, sit for 6 hours; frequently balance; and occasionally climb ramps/stairs. (R. 223, 224). On

December 4, 2008, Charles Kenney, M.D., also non-examining, confirmed Dr. Pilapil's RFC. (R. 231). Neither the reviewers nor Dr. Ezike saw any evidence from Ms. Hurt's treating physician.

The record also includes a few treatment notes from a health center near her home. On February 25, 2009, Ms. Hurt complained of back pain and muscle spasms. (R. 249). Dr. Govinda's Musculoskeletal exam revealed multiple scars over the back midline and scoliosis. (R. 249). On October 30, 2009, Ms. Hurt complained of reflux esophagitis and Dr. Rajesh advised her to avoid the NSAID medications she was taking for her back pain. Dr. Rajesh also reported that musculoskeletal exam was within normal limits. (R. 240). On November 18, 2009, Dr. Govinda counseled Ms. Hurt on her borderline sugars/cholesterol levels and the potential for cardiovascular disease as a result of her long-term Celebrex use. (R. 238). Ms. Hurt takes, or has taken, an array of medications: Flexeril (muscle relaxant); Zesoteric and Lisinopril/Hydrochlorothiazide (hypertension); Celebrex (NSAID); Fomatidine (ulcer); Omaprozole and Protonix (reflux); Metformin (diabetes); Pravastatin (choleserol).

### C.

### The Administrative Hearing Testimony

### 1.

### The Plaintiff's Testimony

At her hearing, Ms. Hurt testified that she was unable to work because of her spinal impairment and degenerative arthritis. (R. 34). She was awaiting her third major back surgery. (R. 34). She last worked – or tried to – in April 2008, when her husband was laid off. (R. 32). It was a city bus driving job, but the pain was too much for her so

she didn't even last two weeks. (R. 32-33). She explained that she had to leave her previous job transporting handicapped persons because she could no longer push the wheelchairs due to pain in her back, shoulders, and knees. (R. 33). Ms. Hurt also testified about having to leave her data entry job due to the pain. (R. 43). It was difficult for her to remain seated and turning in her chair caused her pain. (R. 42-43). She wasn't able to do her job while standing, but she was allowed to stand up and move around at her convenience. (R. 41-42). Even so, she had to quit due to her back pain. (R. 41-42).

Ms. Hurt explained that she has pain in her shoulders, back, knees, toes, and fingers. (R. 39). The ALJ didn't ask how severe the pain was. He did ask whether she took pain medication, and Ms. Hurt said she didn't. (R. 40). He also asked, and she confirmed, that she took oral medication for recently diagnosed diabetes and Celebrex for arthritis. (R. 40). She went to the doctor once a month. (R. 40).

Ms. Hurt said she was able to drive, cook, wash dishes, do laundry, and vacuum in stages. (R. 37). She sometimes went grocery shopping, but usually not by herself. (R. 38). She didn't have any hobbies or do any gardening. (R. 39). She didn't drive long distances. (R. 38). She read and watched television. (R. 39). Ms. Hurt said she could stand for ten of fifteen minutes before she had to sit down. (R. 39). She thought she could lift ten pounds. (R. 39). She has some trouble with her balance but has never fallen. (R. 39).

### 2.

### The Vocational Expert's Testimony

Cheryl Hoiseth then testified as a vocational expert ("VE"). She classified Ms. Hurt's past work as a bus driver as light and semi-skilled, while her data entry job was

sedentary and semiskilled. (R. 45). The ALJ asked the VE to assume a person over 55 years old with the capacity for light work except she was unable to crawl or climb ladders, scaffolds, or ropes, could not work at unprotected heights. (R. 46). The VE said that such a person could do Ms. Hurt's past work in data entry and the bus driver job as she performed it, but not as it was described in the Dictionary of Occupational Titles because, there, it was categorized as medium work. (R. 46). The ALJ then asked the VE to assume a person could perform only sedentary work with the same additional restrictions. (R. 46). The VE said that such a person could only perform Ms. Hurt's past work in data entry. (R. 46). When the ALJ added a requirement that the person be allowed to sit or stand alternately, the VE said such a person could still perform data entry work. (R. 47). The VE went on to say that employers would tolerate no more than a day and a half of absences per month, or more than two brief breaks and a lunch period per day. (R. 47).

### D.

### The ALJ's Decision

The ALJ found that Ms. Hurt suffered from the following severe impairments: "kyphosis, degenerative disc disease of the lumbar spine with radiculopathy, diabetes mellitus, and hypertension." (R. 19). The ALJ determined that Ms. Hughes' "did not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Subpt. P, Appendix 1 (20 CFR 404.1520(d), 404. 1525 and 404.1526)." (R. 19). More specifically, she did not meet the listing for her spinal impairment because there was no evidence of nerve root or spinal chord compression and she could ambulate effectively. (R. 19).

Next, the ALJ determined that Ms. Hurt "has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) with restrictions, allowing [Ms. Hurt] the option to sit or stand alternatively at will provided that [she] is not taken off task more than 10% of the work day. [Ms. Hurt] can never crawl or climb ladders, ropes or scaffolds. [She] can occasionally climb ramps or stairs, stoop, crouch and kneel. [She] can frequently balance. [She] must avoid concentrated exposure to unprotected heights." (R. 20). He then found that, while Ms. Hurt's impairments could reasonably be expected to produce her alleged symptoms, her allegations regarding "the intensity, persistence and limiting effects of th[o]se symptoms are not credible to the extent they are inconsistent with" the ALJ's residual functional capacity assessment. (R. 21).

The ALJ then outlined the undisputed medical evidence. He did this briefly enough that his entire treatment of it can be reproduced here:

> Dr. Ezike performed an internal medicine consultative examination of the claimant for the Bureau of Disability Determination Services on July 26, 2008 (Exhibit B2F). The claimant told the doctor that she has a history of back pain. She said that she had been diagnosed with kyphosis and spinal stenosis. She had two back surgeries with no relief. She had steroid injection in 2007, which relieved her pain. She has arthritis in her thumbs and pain in her knuckles. She has difficulty opening jars and bottle tops. She experiences occasional hand weakness, resulting in her dropping objects. Dr. Ezike noted spinal surgery in 2001, lumbar diskectomy in 2002, and right shoulder surgery in 2006. Functionally, the claimant said that she can walk and/or stand for 15 minutes and sit for about 30 minutes at a time. She can lift 20 pounds. Physical examination showed the claimant was able to get on and off the exam table with no difficulty. She could walk greater than 50 feet without support. Gait was non-antalgic without the need for an assistive device. She could toe/heel walk. Ability to grasp and manipulate objects was normal. Range of motion in all joints was normal. Range of motion in the lumbar spine was normal with mild pain. Straight leg raise test was equivocal bilaterally. At the completion of the examination, Dr. Ezike's impression was kyphosis, status post surgery; spinal stenosis, status post surgery; osteoarthritis with pain in the lower back, hips, and hands; and lumbar radiculopathy.

> Dr. Pilapil prepared a Physical Residual Functional Capacity assessment on August 7, 2008 (Exhibit B3F). Dr. Pilapil opined that the claimant was able to perform medium work.
>
> Treatment records from October 30, 2009 (received after the hearing) show that the claimant was seen by her doctor for evaluation and prescription refill with no complaints (Exhibit B5F/8). The musculoskeletal examination was within normal limits on that date. Her hypertension was stable.

(R. 21). The ALJ relied on Dr. Ezike's findings to conclude that Ms. Hurt could perform sedentary work, with some added restrictions. The ALJ said that Ms. Hurt's description of her daily activities was not inconsistent with that finding. (R. 21). Then, the ALJ relied upon the VE's testimony to conclude that Ms. Hurt could perform her past work in computer data entry and was, therefore, not disabled. (R. 22).

## IV.

## DISCUSSION

### A.

### The Standard of Review

The applicable standard of review of the Commissioner's decision is a familiar one. The court must affirm the decision if it is supported by substantial evidence. 42 U.S.C. §§ 405(g). "Substantial evidence is 'such relevant evidence as a reasonable mind might accept to support a conclusion.'" *Schaaf v. Astrue*, 602 F.3d 869, 874 (7th Cir. 2010). The court may not reweigh the evidence, or substitute its judgment for that of the ALJ. *Terry v. Astrue*, 580 F.3d 471, 475 (7th Cir. 2009); *Berger v. Astrue*, 516 F.3d 539, 544 (7th Cir. 2008). Where conflicting evidence would allow reasonable minds to differ as to whether the claimant is disabled, it is the ALJ's responsibility to resolve those conflicts. *Elder v. Astrue*, 529 F.3d 408, (7th Cir. 2008); *Binion v. Chater*, 108 F.3d 780, 782 (7th Cir. 1997). Conclusions of law are not entitled to such deference, however, so

where the Commissioner commits an error of law, the court must reverse the decision regardless of the volume of evidence supporting the factual findings. *Schmidt v. Astrue*, 496 F.3d 833, 841 (7th Cir. 2007).

While the standard of review is deferential, the court cannot act as a mere "rubber stamp" for the Commissioner's decision. *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002). An ALJ is required to "minimally articulate" the reasons for his decision. *Berger*, 516 F.3d at 544; *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). Although the ALJ need not address every piece of evidence, the ALJ cannot limit his discussion to only that evidence that supports his ultimate conclusion. *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994). The ALJ's decision must allow the court to assess the validity of his findings and afford the claimant a meaningful judicial review. *Hopgood ex rel. L.G. v. Astrue*, 578 F.3d 696, 698 (7th Cir. 2009). The Seventh Circuit calls this building a "logical bridge" between the evidence and the ALJ's conclusion. *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996).

**B.**

**The Five-Step Sequential Analysis**

The Social Security Regulations provide a five-step sequential inquiry to determine whether a plaintiff is disabled:

> 1) is the plaintiff currently unemployed;
>
> 2) does the plaintiff have a severe impairment;
>
> 3) does the plaintiff have an impairment that meets or equals one of the impairments listed as disabling in the Commissioner's regulations;
>
> 4) is the plaintiff unable to perform his past relevant work; and

5) is the plaintiff unable to perform any other work in the national economy?

20 C.F.R. §§ 404.1520; *Simila v. Astrue*, 573 F.3d 503, 512-13 (7th Cir. 2009); *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 351-52 (7th Cir. 2005). An affirmative answer leads either to the next step or, on steps 3 and 5, to a finding that the claimant is disabled. 20 C.F.R. §416.920; *Briscoe*, 425 F.3d at 352; *Stein v. Sullivan,* 892 F.2d 43, 44 (7th Cir. 1990). A negative answer at any point, other than step 3, stops the inquiry and leads to a determination that the claimant is not disabled. 20 C.F.R. §404.1520; *Stein*, 892 F.2d at 44. The claimant bears the burden of proof through step four; if it is met, the burden shifts to the Commissioner at step five. *Briscoe*, 425 F.3d at 352, *Brewer v. Chater,* 103 F.3d 1384, 1391 (7th Cir. 1997).

## C.

### Analysis

There are at least two problems with the ALJ's decision that require a remand of his decision. – his treatment of records from Ms. Hurt's treating physician and his assessment of her credibility. First, the ALJ ignored the records from the physician Ms. Hurt saw for treatment of her most significant impairment, her spinal problem. An ALJ doesn't have to mention every piece of evidence, but can't simply ignore a line of evidence that is inconsistent with his conclusions. *Campbell v. Astrue*, 627 F.3d 299, 306 (7th Cir. 2010); *Villano v. Astrue*, 556 F.3d 558, 563 (7th Cir. 2009). The records from Dr. Paul depict a series of failed treatments beginning with surgery, and proceeding through medications, injections, and physical therapy.

The Commissioner argues that the ALJ didn't have to mention this evidence because it was irrelevant – Ms. Hurt worked throughout the time she saw Dr. Paul and

claims an alleged onset date of April 2, 2008. The ALJ didn't provide this reasoning, of course, because he didn't even mention the evidence. Review of the ALJ's decision is confined to the rationale offered by the ALJ, not the *post-hoc* assessments by the Commissioner's lawyer. *See SEC v. Chenery Corp.,* 318 U.S. 80, 93–95 (1943); *Tumminaro v. Astrue,* 671 f.3d 629, 632 (7th Cir. 2011); *Spiva v. Astrue,* 628 F.3d 346, 353 (7th Cir. 2010).

Moreover, the evidence is not irrelevant. It is true that Ms. Hurt alleged an onset date of April 2, 2008, but her condition is a chronic and degenerative one. The only MRI on record shows severe stenosis or narrowing of the spinal canal. It didn't just go away. Dr. Ezike made it a part of his diagnosis. Surgery clearly hadn't corrected it, as Dr. Paul feared that yet another fusion might be indicated. Moreover, Ms. Hurt wasn't working the entire time she was seeing Dr. Paul. She only sought a release for work once her husband lost his job, and financial necessity impelled her to try to work. Her work attempt, as she testified at her hearing, was short-lived because she could not physically do what was required.

In addition, the evidence from Dr. Paul tends to undermine the ALJ's credibility finding. As long as an ALJ has explained his decision, his credibility determination will not be overturned unless it is patently wrong. *McKinzey v. Astrue*, 641 F.3d 884, 890 (7th Cir. 2011). But the ALJ may not "discredit the claimant's testimony as to subjective symptoms merely because they are unsupported by objective evidence." *Simila v. Astrue*, 573 F.3d 503, 517 (7th Cir. 2009); *Carradine v. Barnhart,* 360 F.3d 751, 753 (7th Cir. 2004); 20 C.F.R. § 404.1529(c)(2). "To evaluate credibility, an ALJ must 'consider the entire case record and give specific reasons for the weight given to the individual's

statements.'" *Simila*, 573 F.3d at 517 (quoting SSR 96-7p). An ALJ should look to a number of factors to determine credibility, such as the objective medical evidence, the claimant's daily activities, allegations of pain, aggravating factors, types of treatment received and medication taken, and "functional limitations." *Simila*, 573 F.3d at 517; *Prochaska v. Barnhart,* 454 F.3d 731, 738 (7th Cir.2006); 20 C.F.R. § 404.1529(c)(2)-(4).

In assessing Ms. Hurt's credibility, the ALJ said that her "medically determinable impairments could reasonably be expected to produce the alleged symptoms . . . [her] statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with" the RFC. (R. 21). The Seventh Circuit, noting its frequent use by ALJs in their decisions, has repeatedly criticized this template as "unhelpful," *Shauger v. Astrue,* 675 F.3d 690, 696–97 (7th Cir.2012), "opaque," *Bjornson v. Astrue,* 671 F.3d 640, 644–45 (7th Cir.2012), and "meaningless," *Parker v. Astrue,* 597 F.3d 920, 921–22 (7th Cir.2010). The court has explained that it backwardly "implies that the ability to work is determined first and is then used to determine the claimant's credibility." *Bjornson,* 671 F.3d at 645–46. More importantly, it fails to indicate which statements are not credible and yields no clue to what weight the ALJ gave a claimant's testimony. *See Spiva,* 628 F.3d at 346; *Parker,* 597 F.3d at 920. In short, this sort of boilerplate is inadequate, *by itself,* to support a credibility finding. *Richison v. Astrue,* 2012 WL 377674, *3 (7th Cir.2012).

One has to read between the lines a bit to discover that the ALJ's reasons for doubting Ms. Hurt "to [an] extent" seem to be the objective medical evidence – which isn't enough to support a credibility determination on its own – and her daily activities.

*See Spiva*, 628 F.3d at 353 (criticizing ALJ for not specifically linking piece of evidence to credibility).

Significantly, the ALJ did not even mention Ms. Hurt's treatment, although the regulations state that it is relevant to a credibility determination. 20 CFR §404.1529(c)(3). Yet, Ms. Hurt has embarked on an extensive and aggressive course of treatment. It is improbable that she would undertake a course of multiple injections and take drugs for relief of her back pain even when a physician counseled her that they might cause other serious problems (*i.e.* cardiac) if she were not in significant pain. *See Carradine v. Barnhart*, 360 F.3d 751, 755 (7th Cir. 2004). Instead, the ALJ simply remarked that Ms. Hurt has not been prescribed pain killers. That's probably because, at the hearing – which took a mere 26 minutes – he didn't ask her whether she took anything else or whether anything gave her relief. In fact, she takes a lot of medication including Celebrex for her back problems, which are not eliminated. Even the cluster of injections she received provided her with only temporary minimal relief.

But the ALJ didn't know anything about this because he didn't consider the evidence from Dr. Paul and didn't ask Ms. Hurt, who was not represented by counsel at the hearing. The ALJ was thus "supposed to try by questioning [her] to obtain all information relevant to [her] claim, . . . . much like an investigating magistrate in a Continental legal system, rather than assume, as in an adversarial setting in which the plaintiff is *pro se*, that [s]he is capable of providing the information that [her] lawyer, if [s]he had had one, would have elicited on direct examination." *Spiva*, 628 F.3d at 352. Instead, the ALJ's questioning was perfunctory, at best. He not only didn't ask Ms. Hurt

about her treatment, he didn't ask what precipitated her pain or how severe it was. It simply did not appear relevant to him.

Without any medical evidence from the physician who treated Ms. Hurt for her main problem, the ALJ was left with a brief consultative examination and a few notes from doctors at a clinic where Ms. Hurt went a few times to follow up on her diabetes and hypertension. From the clinic notes, the ALJ tendentiously chose a single date when Dr. Rajesh said Ms. Hurt's musculoskeletal exam was within normal limits. *Cf. Scott v. Astrue*, 647 F.3d 734, 740 (7th Cir. 2011)(in mental impairment case, ALJ not permitted to cherry-pick an isolated instance where plaintiff was having a good day); *Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010). Ms. Hurt had come in that day to follow up on her hypertension medication and with a complaint about her reflux esophagitis, so her back impairment wasn't even a focus of the appointment. That's little better than a cropped snapshot of Ms. Hurt's condition. Still, the consultative examination and the isolated treatment note might be enough to support the ALJ's decision, but for the record of treatment by Dr. Paul. Oddly, the ALJ failed even to mention it.

As for Ms. Hurt's daily activities, they are not sufficient to hang a credibility finding on. The ALJ asked whether she was able to drive, cook, wash dishes, do laundry, and vacuum. (R. 37). She said she was able to do these things, but there is little to suggest how often. She can't drive for very long and she indicated that she had to take breaks when she vacuumed. (R. 37-38). Beyond that, she reads and watches television. (R. 39). Activities such as cooking, cleaning, doing laundry, and vacuuming do not necessarily equate with a capacity to perform a full-time, sedentary job. *See Stewart v. Astrue,* 561 F.3d 679, 684 (7th Cir.2009).

15

It is of no significance that Ms. Hurt reads and watches T.V. Unless a claimant is essentially comatose, those activities do not reflect on any ability to work. "The pressures, the nature of the work, flexibility in the use of time, and other aspects of the working environment as well, often differ dramatically between home and office or factory or other place of paid work." *Mendez v. Barnhart*, 439 F.3d 360, 362 (7th Cir. 2006). At the very least, the ALJ ought to have explained how Ms. Hurt's activities were inconsistent with a claim of disability. *Stewart,* 561 F.3d at 684.

Some things are obvious and thus need no explication to explain an inconsistency between daily activities and a claim of disability. But not the activities reflected on this record. If the ALJ thought that the minimal activities in which Ms. Hurt engaged at home supported his conclusion that Ms. Hurt was not disabled, he was obligated to explain why. Moreover, we don't know how regularly Ms. Hurt performs the activities about which she testified. We do know that the ALJ did not mention that Ms. Hurt had to take breaks when vacuuming or could not drive for long.

An ALJ cannot disregard a claimant's limitations in performing household activities. *Moss v. Astrue*, 555 F.3d 556, 562 (7th Cir. 2009); *See Craft v. Astrue,* 539 F.3d 668, 680 (7th Cir. 2008). There is more that could be said about the ALJ's approach to this case. But the preceding is enough to demonstrate that the plaintiff's motion for summary judgment or remand [#16] should be GRANTED, and the Commissioner's motion for summary judgment should be DENIED.

ENTERED: _____

UNITED STATES MAGISTRATE JUDGE

**DATE:** July 30, 2012